# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT


**06-597**


**CHERYL BENNETT**

**VERSUS**

**SOILEAU ANIMAL HOSPITAL**


**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 03
PARISH OF CALCASIEU, NO. 01-06326
SAMUEL LOWERY, WORKERS' COMPENSATION JUDGE
**********

**SYLVIA R. COOKS**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, John D. Saunders, and Marc T. Amy, Judges.

Amy, J., dissents and would grant the exception of prescription.

**AFFIRMED.**

**Marshall J. Simien, Jr.**
**Simien Law Firm**
**Capitol One Tower, Suite 1110**
**One Lakeshore Drive**
**Lake Charles, LA 70629**
**(337) 497-0022**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
        **Cheryl Bennett**

**Frank R. Whiteley**
**John V. Quaglino**
**Juge, Napolitano, Guilbeau, Ruli, Frieman & Whiteley**
**3320 West Esplanade Avenue North**
**Metairie, LA 70002**
**COUNSEL FOR DEFENDANT/APPELLANT:**
        **Sears, Roebuck & Company**

**COOKS, Judge.**

Defendant, Soileau Animal Hospital, appeals the denial of its Exception of Prescription by the Office of Workers' Compensation. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Cheryl Bennett worked for Soileau Animal Hospital from August 1992 through November 1993. Her duties included cleaning pens, feeding animals, and grooming/bathing animals. To bathe the animals, Ms. Bennett was required to dip them in various pesticides. Ms. Bennett testified, through the course of the day, her clothing would become soaked from various pesticides.

Ms. Bennett claims she began developing health problems during her employment at Soileau Animal Hospital. She testified she eventually became physically weak and began suffering memory loss. Although she began to gradually experience these health problems, at the time she did not suspect they were caused by her employment.

Ms. Bennett first sought treatment for her alleged symptoms on October 2, 1995, with Dr. Andrew Campbell, a toxicologist located in Houston. During this time, Ms. Bennett was a plaintiff in breast implant litigation and learned of Dr. Campbell at a seminar in conjunction with that litigation. Dr. Campbell diagnosed her as suffering from a series of autoimmune system disorders, chronic fatigue syndrome, and multiple chemical sensitivity. Dr. Campbell believed Ms. Bennett's problems were related to her breast implants, although Defendant argues Dr. Campbell did advise Ms. Bennett her problems could be related to her working with pesticides. Ms. Bennett eventually had her breast implants removed in 1998.

Despite the implant removal surgery, Ms. Bennett continued to experience

health problems. She testified that while reading the Houston Chronicle's December 6, 2001 edition she came upon an article discussing how the U.S. Environmental Protection Agency was going to phase out Dursban, the most widely used pesticide in the country, and one used extensively in her work at Dr. Soileau's clinic. The article discussed how certain pesticides, including Dursban, caused human health risks.

After reading the article, Ms. Bennett informed Dr. George Matewere of her concerns. Dr. Matewere ordered an MRI of Ms. Bennett's brain, which was taken on March 27, 2001. The MRI revealed a deterioration of the myelin sheath of nerve tissue. Ms. Bennett then saw Dr. Thomas Calendar, a toxicologist, who believed her current medical problems could have been caused by or related in part to her exposure to pesticides at Soileau Animal Hospital.

Ms. Bennett then filed suit against Defendant in state district court on June 5, 2001, alleging that Dr. Soileau intentionally exposed her to chemicals whose dangerous propensities he either knew or should have known; thus, he failed to provide her a safe working environment.

Shortly thereafter, on August 28th, 2001, she filed the present claim in the Office of Workers' Compensation seeking medical treatment and wage benefits. She asserted she contracted an occupational disease while engaged in the course and scope of her employment with Soileau Animal Clinic. On April 30, 2004, the employer filed an Exception of Prescription alleging claimant's suit had prescribed pursuant to the time limitation for occupational disease claims set forth in La.R.S. 23:1031.1(E). The trial court, after reviewing the evidence, determined that Ms. Bennett did not have knowledge that her injuries were occupationally related until December 6, 2000, and her suit filed on August 23, 2001 was not prescribed.

The employer lodged this appeal, contending the trial court erred as a matter of law in denying the Exception of Prescription because Ms. Bennett's claim for occupational illness was not filed within six months of the time she knew or had reasonable grounds to believe her disease was occupationally related.

## ANALYSIS

Initially, the Defendant argues the trial court incorrectly applied a one-year prescriptive period rather than a six-month prescriptive period. La.R.S. 23:1031(E), as it existed at the time Ms. Bennett was allegedly injured, provided:

> E. All claims for disability arising from an occupational disease are barred unless the employee files a claim with his employer within six months of the date that:
>
> (a) The disease manifested itself.
>
> (b) The employee is disabled from working as a result of the disease.
>
> (c) The employee knows or has reasonable grounds to believe that the disease is occupationally related.
>
> Notice filed with the compensation insurer of such employer shall constitute a claim as required herein.

Subsection (E) of La. R.S. 23:1031.1 was amended by Acts 2001, No. 1189, § 1, and now provides a one-year prescriptive period for notice of occupational disease claims. This amendment became effective June 29, 2001.

Louisiana Civil Code article 3462 provides that prescription is interrupted when an action is commenced in a court of competent jurisdiction and proper venue. In regard to a workers' compensation claim, La.R.S. 23:1031.1(E) provides:

> E. All claims for disability arising from an occupational disease are barred unless the employee files a claim with his employer within six months of the date that:
>
> (a) The disease manifested itself.
>
> (b) The employee is disabled from working as a result of the disease.

(c) The employee knows or has reasonable grounds to believe that the disease is occupationally related.

Notice filed with the compensation insurer of such employer shall constitute a claim as required herein.

In *LaCour v. Hilti Corp.*, 98-2691 (La. 5/18/99), 733 So.2d 1193, the Louisiana Supreme Court concluded that La.R.S. 23:1031.1(E) requires only that notice be given of an occupational disease to the employer within the six-month period rather than the actual filing of a claim with the Office of Workers' Compensation. The *LaCour* court stated as follows:

[La.R.S. 23:1031.1(E)] requires that the employee file a claim with his employer within six months of the date that the disability commences or the claim is barred. The statute does not say that a formal disputed claim must be filed with the Office of Workers' Compensation within the six month period. In *Duplechain v. Gulf States Utility Co.*, 468 So.2d 1386, 1389 (La.App. 3d Cir.1985), the third circuit concluded that the language of the statute suggests that its time limitation applies only to the "notification" of an employer of an occupational disease rather than the actual filing of a petition to recover compensation benefits. It reasoned:

From a liberal reading of this phrase, as we are mandated to do in interpreting the workmen's compensation laws, it appears that the statute does not contemplate a lawsuit against an employer but merely the notification of such employer. This interpretation is supported by another stipulation of the statute which states that the notification of the employer's compensation carrier will constitute compliance with the notification requirements of 23:1031.1.

We agree that La. R.S. 23:1031.1(E) requires only that notice be given to the employer or to the compensation insurer within six months of a determination that the claimant is disabled as a result of an occupational disease. What constitutes notice will depend upon the facts and circumstances of the particular case. In *Edwards v. Sawyer Industrial Plastics*, 26,320 (La.App.2d Cir.12/07/94); 647 So.2d 449, the employee wrote a letter to his employer stating that while in the workplace, he sustained total disability from working. In *Winzor v. Augenstein Construction Co., Inc.*, 378 So.2d 470 (La.App. 3d Cir.1979), *writ denied*, 379 So.2d 1103 (La.1980), the employee was visited by his job superintendent while he was hospitalized for tests. At that time, the employee told his superintendent that he had a lung disease and would not be able to return to work as a welder due to

-4-

smoke and dust on the job. In *Riley v. Avondale Shipyards*, 305 So.2d 742 (La.App. 4th Cir.1975), plaintiff's notification of the employer's insurance department of his retirement because of disability was sufficient to satisfy La. R.S. 23:1031.1(E). In the instant case, we find that the notice requirement was satisfied. Hilti was aware that Mr. LaCour was suffering from carpal tunnel syndrome and pain in both elbows for years and that such conditions were related to his work duties. In November of 1995, Hilti wrote a letter to Mr. LaCour indicating that his short-term disability benefits were about to expire and he would be terminated if he did not return to work on January 11, 1996. In letters dated December 28, 1996 and January 31, 1996 from Dr. Gosey to Sun Life, Hilti's disability insurer, Dr. Gosey stated that Mr. LaCour's previous employment, specifically the demonstration of vibrating machines, caused Mr. LaCour's problems to his elbows to begin with and he should not return to his employment because it would cause further destruction and deterioration to his elbows. These letters state that Mr. LaCour is disabled as a result of his employment. We find that these events served as timely notification to Hilti that Mr. LaCour was disabled as a result of an occupational disease so as to satisfy La. R.S. 23:1031.1(E).

*Id.* at 1196-97.

In the present case, Ms. Bennett filed a tort suit in district court on June 5, 2001, (within six months of the December 6, 2000 article) alleging that Dr. Soileau intentionally exposed her to chemicals whose dangerous propensities he either knew or should have known, and that he failed to provide her with a safe working environment. Defendant answered the suit. This was more than sufficient to meet the notice requirement of La.R.S. 23:1031.1(E), and would interrupt prescription.

Defendant also contends the workers' compensation judge's conclusion regarding the date Ms. Bennett had knowledge of the alleged occupational disease for purposes of La.R.S. 23:1031.1(E) was fatally flawed. The workers' compensation judge gave the following reasons for concluding the prescriptive period began to run on December 6, 2000:

The law, specifically Louisiana R.S. 23:1021.1(E), clearly states that a claim is prescribed unless it is filed within one year that, one, the disease manifests itself; two, the employee becomes disabled as a result of the disease; and, three, and the employee knows or has reasonable grounds to believe that the disease is occupationally related. The

-5-

jurisprudence says that all three of these factors must exist for prescription to run.

There's no controversy regarding the first two issues. The disputed issue is whether she filed her claim within one year of the date that she knew or had reasonable grounds to believe that her disease was occupationally related. Testimony was that Ms. Bennett worked for Dr. Soileau and his animal clinic on two occasions, the first as a surgical assistant; the second time she worked from August 1992 to November of '93 as an animal groomer where her duties included bathing the animals and dipping them in various pesticides. Ms. Bennett testified that on a daily basis her clothing was soaked with the pesticide chemicals used and eventually her hand started breaking out. Eventually she grew physically weak and began suffering memory loss and felt skin crawling sensations. Her attorney argues that unbeknownst to her, she was suffering from extensive dermal and inhalation exposure to the chemical nerve agents which are used in the pesticide which had only recently been banned. Although she began to gradually experience these health problems, she said she never suspected at the time that they were caused by her employment.

To explain her conclusion in this regard, her attorney introduced evidence regarding the claimant's extensive and lengthy medical history. She began seeing Dr. Andrew Campbell, a Houston toxicologist, and he diagnosed Ms. Bennett as suffering from a series of autoimmune system disorders, chronic fatigue syndrome, and multiple chemical sensitivity. He concluded that her physical impairments rendered her permanently disabled. However, apparently Dr. Campbell felt that Ms. Bennett's symptoms were related to her having breast implants since 1994. He opined that she suffered from silicone induced immune dysfunction syndrome. Dr. Campbell ordered blood tests for Ms. Bennett which showed elevated levels, particularly her liver enzymes. Follow up tests were taken a year later and showed normal blood levels, although her breast implants had not yet been removed. When asked to explain this phenomenon, Dr. Campbell said that, quote, "Maybe it wasn't the silicone. Maybe it was the pesticides", end of quote.

My understanding of Dr. Campbell's comments is that he was suggesting that perhaps her one time elevated blood levels were related to her working around pesticides. I frankly cannot see how such an observation standing alone can give rise to a presumption that Ms. Bennett should have reasonably known her illness was related to her occupation. This is especially true since her blood levels returned to normal. The record is clear that she was seeing Dr. Campbell for a suspected autoimmune disorder caused by breast implant disease. Diagnosis would have made it quite reasonable that she was especially susceptible to environmental exposures; and once those sources of exposure were removed, the effects would disappear. However, although Ms. Bennett's blood work went back to normal, her symptoms remained and her illnesses, however, did not subside.

I cannot see where in the record Dr. Campbell expressed any specific concern about her having been around pesticides, and he did not discuss any hazards associated with those pesticides and clearly he did not deviate from his focus on breast implant disease and autoimmune disorders caused by silicone. Doctors she saw subsequent to Dr. Campbell apparently kept saying that there was nothing wrong with her. Counsel argues that despite her health issues, Ms. Bennett had no independent reason to believe her illness was caused by pesticide exposure. In fact, her treating psychologist, after comprehensive blood testing, gave her reason to believe that her breast implants were the sole cause of her problems.

Ms. Bennett says some time thereafter, while reading the "Houston Chronicle", she saw an article on December the 6th dealing with how certain pesticides caused human health risks and discussing how the U.S. Environmental Protection Agency would begin to phase out Dursban, the most widely used pesticide in the country, and one used extensively in her work at Dr. Soileau's clinic.

Ms. Bennett informed her family physician, Dr. George Matewere, of her suspicions. He ordered an M.R.I. of Ms. Bennett's brain, which was taken on March the 27th of 2001 and showed multiple areas of abnormal signal appearing as a removal of the myelin sheath of nerve tissue.

On April the 24th, 2001, Ms. Bennett was seen by Dr. Thomas Calendar, a Lafayette toxicologist, who said that, quote, his medical opinion was that some of her current medical problems could have caused by or contributed to by her workplace chemical exposures at the veterinary clinic.

Ms. Bennett then filed suit against the defendant in state district court on June the 5th, 2001, alleging, among other things, that Dr. Soileau intentionally exposed her to chemicals whose dangerous propensities he either knew or should have known, failing to provide a safe working environment. Shortly thereafter, on August 28th, 2001, the present action was filed here with the Office of Workers' Compensation. Both actions were filed within one year of the time Ms. Bennett learned of the phase out of the pesticides used by her in Dr. Soileau's animal clinic.

The evidence shows clearly that Ms. Bennett filed this claim within one year of December 6, 2000, the time she discovered pesticides she worked with ast Dr. Soileau's animal clinic were being banned for causing extensive neurological problems. Only then, I think, did she have reasonable grounds to believe her injuries were occupationally related.

For these reasons, the defendant's exception of prescription is denied.

We find the trial court did not err in finding the earliest date Ms. Bennett had reasonable grounds to trigger the running of prescription under La.R.S. 23:1031.1(E) was on December 6, 2000. Defendant argues that based upon her conversation in 1997 with Dr. Campbell that pesticides could be related to her health problems, Ms. Bennett gained knowledge on that date sufficient for prescription to begin running. The WCJ specifically discussed this argument, and concluded the medical record did not show Dr. Campbell expressed specific concerns about her having been around pesticides, and he did not depart from his primary focus that her problems were caused by breast implant disease. The WCJ's finding that prescription began to run on December 6, 2000 was well within his discretion and not erroneous.

## DECREE

For the foregoing reasons, the judgment of the Office of Workers' Compensation is affirmed. Costs of this appeal are assessed to Defendant-Appellant, Soileau Animal Hospital.

**AFFIRMED.**